**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

ZAINAB KAMARA,                                    *

Plaintiff                                         *

v                                                 *          Civil Action No. ELH-15-3952

PRINCE GEORGE'S COUNTY DEPARTMENT     *
OF CORRECTIONS, *et al.*,
Defendants                                        *
                                            ***

## <u>MEMORANDUM OPINION</u>

Zainab Kamara, the self-represented plaintiff, filed a civil rights suit against a host of defendants, pursuant to 42 U.S.C. § 1983, arising out of a seemingly unprovoked and brutal attack upon plaintiff in 2014, committed by a fellow detainee at the Prince George's County Department of Corrections ("PGCDC").[1]  ECF 1; ECF 4.   In general, she alleges that the correctional defendants failed to protect her and that she was provided inadequate medical care for the injuries she sustained during the assault.

Defendants Abu Kalokoh; Meskerem Asresahegn, M.D.; and David Ijeh, M.D. ("Medical Defendants) filed a motion to dismiss or, in the alternative, for summary judgment. ECF 30.  It is supported by a memorandum (ECF 30-1) (collectively, "Medical Defendants' Motion") and several exhibits.  Defendants PGCDC; Mary Lou McDonough; Harry L. Hilton; Adedeji Adewunmi; Corporal Diamon Baker; Corporal Shayla Stewart; Private First Class Yvette Ford; and Corporal Dawn Taylor  ("Correctional Defendants") have moved for summary judgment.  ECF 44.[2]  Their motion is supported by a memorandum (ECF 44-1) (collectively,

---

[1] At the time, plaintiff was awaiting trial in the Circuit Court for Prince George's County on multiple charges.  *See* ECF 44-2.  She has since been convicted.  *Id.*

[2] The Clerk shall amend the docket to reflect the full and correct names of defendants.

"Correctional Defendants' Motion") and exhibits, including a surveillance or tier video of the assault. *See* ECF 44-4. Plaintiff opposes both motions. ECF 36; ECF 48; ECF 49. In sum, her contentions are similar to the allegations in her suit. The Medical Defendants filed a Reply at ECF 37, along with another exhibit. ECF 37-1.

In a status report submitted by plaintiff on November 7, 2016 (ECF 43), plaintiff asserted that she could not download the surveillance video and thus she was unable to review it. *Id.* at 2-3. She asked for the "Win-Media format." *Id.* at 3. By Order of February 3, 2017 (ECF 51), I directed counsel for the Correctional Defendants, within fourteen days of my Order, to provide Kamara with the opportunity to review the video. *Id.* In a letter of February 15, 2017 (ECF 52), counsel advised that plaintiff viewed the DVD on that date, from 11:05 a.m. to 12:25 p.m. *Id.* Counsel also stated that plaintiff would be furnished with another copy of the DVD, for her use. *Id.* In my Order (ECF 51), I gave plaintiff ten days to supplement her response after she viewed the video. She did so on February 23, 2017. *See* ECF 53.

No hearing is necessary to resolve the motions. *See* Local Rule 105.6 (D. Md. 2016). For the reasons that follow, defendants' motions, construed as motions for summary judgment, shall be granted.

## I.      Factual Background

On November 19, 2014, while Kamara was detained at PGCDC, she was viciously attacked in the lunch room by fellow detainee Erika Sellers.[3] Plaintiff claims that she "almost lost [her] life." ECF 1 at 3. According to plaintiff, Sellers is mentally ill and has a history of attacking other inmates. *Id.* Further, Kamara asserts that during the assault she twice lost consciousness, but the officers on duty during the attack, Baker, Stewart, Ford, and Taylor, failed

---

[3] The assailant's name appears in the record as Seller and Sellers. *See*, *e.g.*, ECF 1 at 3; ECF 30-1 at 2. ECF 30-4, ¶ 5; ECF 44-1 at 3. The discrepancy is immaterial to the issues.

to call for the emergency response team ("ERT") in a "timely manner." *Id.* Plaintiff also states that when Officer Stewart wanted to call the ERT, Baker, the lead officer, told Stewart to let plaintiff get "her ass bit up first . . . ." *Id.* In addition, plaintiff asserts that "the officers did nothing to protect [her] or assist [her], no [sic] even try to stop it, it was a total negligent . . . ." *Id.* Rather, the officers "were saying fight back Kamara," expected her to fight back, and were "cheering the fight . . . ." *Id.* Plaintiff also complains that it took "about fifteen mins [sic] for the ERT to come and stop it." *Id.* According to Kamara, when the ERT arrived, she "was on the floor lifeless, hopeless, and helpless . . . ." *Id.*

Plaintiff claims that she suffered multiple injuries, including a soft tissue head injury, and endured extreme pain. Moreover, plaintiff asserts that she "was never take [sic] to the hospital even with inter cranial fluid (CF) is coming out of [her] nose" and her "maxillary artery was open . . . ." *Id.* According to plaintiff, she received inadequate medical care.

Kamara indicates that she filed criminal charges against Sellers regarding the attack but was not transported to court by the PGCDC on the date of Sellers's trial. *Id*. at 3-4. Because plaintiff was not present to testify, the charges against Sellers were dropped. *Id*. at 4. Further, plaintiff indicates that she asked for inmate grievance forms but never received them. *Id*. at 2-3.

Plaintiff clarified her claims in her amendment to the complaint. *See* ECF 4. She asserts that she is at risk of harm and an easy target due to her background and accent. *Id.* at 1. Additionally, plaintiff indicates that she has sued Mary Lou McDonough as the Director of the PGCDC. According to plaintiff, McDonough was "grossly negligent" in managing the correctional officers. Plaintiff also claims that McDonough was aware of the violation of plaintiff's rights but did nothing to correct the situation. Further, she alleges that McDonough is responsible for housing mentally ill inmates with plaintiff. *Id.*

Lt. Col Harry L. Hilton was the Chief of Security at the time of the assault and it was his job to insure the safety of the inmates.  Plaintiff asserts that "he was very negligent" because he did not seek care for plaintiff until three days after the attack.  *Id.*

Kamara alleges that Abu Kaloko, Medical Administrator, did nothing "to help meet" her "medical needs . . . ."  *Id.*at 2.  She also alleges that Kaloko charged plaintiff for medication. Plaintiff states that she submitted several forms to obtain medical records but never received anything. *Id*.

In addition, plaintiff complains that Meskerem Asresahegn, M.D., the facility physician, did not see her until a week after the attack.  On several occasions, plaintiff requested to be transported to the hospital, because she was suffering severe pain in her back, neck, side, and suffered from headaches. *Id*.  But, Dr. Asresahegn refused to have plaintiff transported to the hospital for a second opinion.  *Id.*

According to plaintiff, David Ijeh, M.D., the psychiatrist for the institution, knew that Sellers was mentally ill, with a history of attacking other inmates.  However, he did nothing to prevent the episode.  *Id.*  at 2.  Similarly, plaintiff states that the administration at PGCDC knew about the mental history of Sellers, yet they did nothing to prevent the attack. *Id*. at 4.

According to plaintiff, Sgt. Adewunmi was the supervisor on duty at the time of the attack. *Id*.  Plaintiff maintains that he "did nothing to prevent" this "attack."  *Id*. at 2.

Further, Kamara claims that Officer D. Baker was "the lead staff on duty" on the day of the "deadly attack," and "[s]he did nothing to stop the attack.  She was cheering" for plaintiff to fight back. *Id*. at 3.  Nor did Baker call the ERT "on time," and she advised plaintiff that facility protocol did not allow her to stop the attack.  *Id.*  Plaintiff alleges that Baker did not follow facility policy and procedure to protect plaintiff and promote safety.  *Id.*

4

Officers Stewart, Ford, and Taylor were also on duty at the time of the attack and allegedly did nothing to stop the fight. *Id*. at 3-4. According to Kamara, Stewart encouraged her to fight back. *Id*. at 3. Plaintiff also states that Stewart attempted to call the ERT but was stopped by the lead officer. *Id*.

Plaintiff submitted declarations from three fellow detainees who witnessed the assault. Ashley McCrae avers that when plaintiff was attacked by Sellers on November 19, 2014, four correctional officers did not protect Kamara, and the ERT was not called for "some good amount of time." ECF 12 at 1. Helene Newsome avers that she saw Sellers attack plaintiff while the officers "were just standing their [sic] do nothing to stop the attack." ECF 12-1 at 1. She avers that it took "almost 15 min[utes] before the ERT come to the unit . . . . *Id*. Further, she asserts that the staff "neglected to maintain the order and protect Kamara against the violence . . . ." *Id*. Jade Cooper avers that she heard the attack but did not see it. Cooper recalls that she heard an inmate screaming for Sellers to stop but officers were urging plaintiff "to fight back" as plaintiff cried for help. According to Cooper, the fight went on for about fifteen minutes before she heard the ERT team. ECF 12-2 at 1.

Defendants do not dispute that plaintiff was spontaneously assaulted by Sellers. Corporal Diamon Garrison (formerly Diamon Baker), Corporal Shyla Stewart, Private First Class Officer Yvette Ford, and Corporal Dawn Taylor each aver that on November 19, 2014, they were assigned to Housing Unit 3 ("H-3") at the PGCDC, where plaintiff was housed. ECF 44-3 at 2, ¶ 3 (Baker Affidavit); ECF 44-5, ¶ 3 (Stewart Affidavit); ECF 44-6, ¶ 2 (Ford Affidavit); ECF 44-7, ¶ 3 (Taylor Affidavit). As the detainees were eating lunch, they observed Sellers approach plaintiff from behind and begin hitting plaintiff with a closed fist. No loud arguing preceded the assault. ECF 44-3 at 2,  ¶ 3-4; ECF 44-5, ¶ 4; ECF 44-6, ¶ 3; ECF 44-7, ¶ 4. Stewart

immediately called a "Signal 80" over the radio, requesting the ERT to respond to the unit. Stewart also ordered the detainees to "lock in."  ECF 44-3 at 2-3, ¶ 5; ECF 44-5, ¶¶ 5 & 6; ECF 44-6, ¶ 4; ECF 44-7, ¶ 5.  Ford and Taylor also commanded the detainees to lock in while Ford operated the control panel to secure the doors and Taylor went upstairs to make sure the detainees were secured as ordered.  ECF 44-6, ¶¶ 5 & 8; ECF 44-7, ¶ 6.  Baker was the first officer to approach Sellers and plaintiff, when plaintiff was on the ground.  ECF 44-3 at 3, ¶ 12.

Baker and Stewart saw Sellers kick plaintiff after plaintiff fell to the ground. ECF 44-3 at 3, ¶ 6.; ECF 44-5, ¶ 7.  Both Baker and Stewart approached Sellers and commanded her to stop kicking plaintiff. Sellers briefly complied and yelled "Back the fuck up! You bitches know how I go.  I will fuck ya'll up too."  ECF 44-3 at 3,  ¶ 7; ECF 44-5, ¶ 8. Baker and Stewart continued to direct Sellers to stop the assault upon plaintiff, but Sellers refused to obey the commands. ECF 44-3 at 3, ¶ 9; ECF 44-5, ¶ 9.  The ERT responded to the unit, quelled the situation, and escorted both detainees to the medical unit.  ECF 44-3 at 3,  ¶ 10; ECF 44-5, ¶ 10; ECF 44-6, ¶ 6.

Corporal Baker, Corporal Stewart, Private First Class Ford, and Corporal Taylor averred that they had no prior reason to believe that Sellers would attack Kamara, nor was there any indication that Sellers harbored ill will towards plaintiff.  ECF 44-3, ¶ 13; ECF 44-5, ¶ 12; ECF 44-6, ¶ 9; ECF 44-7, ¶ 9.  Moreover, plaintiff had never expressed concern about Sellers prior to the incident.  ECF 44-3, ¶ 14; ECF 44-5, ¶ 13; ECF 44-6, ¶ 10; ECF 44-7, ¶ 10.  This was the first time that they saw Sellers attack plaintiff.  *Id.*  After the incident, Baker completed an incident report.  ECF 44-3 at 3, ¶ 11; *see* ECF 44-3 at 21-22.

Baker, Stewart, Ford, and Taylor each reviewed the surveillance video, which is discussed, *infra*.  Each has averred that it is a fair and accurate depiction of the incident.  ECF 44-3 at 3, ¶ 11; ECF 44-5, ¶ 11; ECF 44-6, ¶ 7; ECF 44-7, ¶ 8.  Baker identified herself as the

first officer who ran to the scene when plaintiff was already on the ground, by the pay phone. ECF 44-3 at 3 ¶ 12. Stewart identified herself as the officer behind the desk who picked up the radio to call ERT. ECF 44-5, ¶ 11. Ford identified herself as the officer behind the desk working the control panel. ECF 44-6, ¶ 7. Taylor identified herself as the officer who walked upstairs. ECF 44-7, ¶ 8.

On the date of the incident, Adedeji Adewunmi was the Zone Commander for Zone 4, shift 2, working in a supervisory capacity.  ECF 44-8, ¶ 3. He was not present on H-3 when the assault occurred. However, he heard the Signal 80 for the ERT and responded to the incident.  *Id*. ¶ 4.  When he arrived on H-3 the ERT was already there.  *Id*. ¶ 6.  After the incident Adewunmi conducted an investigation, which included review of the video footage, interviews of the correctional officers and detainees, and instructions to Baker to complete an incident/infraction report.  *Id*. ¶ 7.  As a result of the investigation, Adewunmi charged Sellers with rule violations, including Failure to Obey Orders of Staff, Threat to Staff, and Assault.  *Id*. ¶ 8, ECF 44-8 at 5. Adewunmi also provided plaintiff with a notification of rights form and plaintiff initiated criminal charges against  Sellers. *Id*. ¶ 9; ECF 44-7 at 7.  Adewunmi maintains that he had no reason to expect such conduct by Sellers.  ECF 44-8, ¶¶ 10 & 11.

Doctor Ijeh is employed as a psychiatrist at the PGCDC.  ECF 30-4, ¶ 1.  He has been licensed in Maryland since 1994.  *Id*. ¶ 3.  Ijeh avers that he personally treated both plaintiff and Sellers, and "was not aware of any propensity for violence on the part of Sellerss." *Id*.¶ 5.  Nor was he aware that she ever had attacked other inmates.  *Id*.  Ijeh further avers that he was not aware of a risk of harm to plaintiff.  *Id*.  He also recounts plaintiff's mental health treatment while detained.  ECF 30-4, ¶¶ 6-27.

The Prince George's County Correctional Center Policy and Procedure Manual is relevant. ECF 44-3 at 8. Section D provides, in pertinent part, that where there is a disturbance in the housing unit the housing unit officer will:

1.    Notify the Central Control Officer via radio or the emergency phony system;
2.    Order the non-involved inmates to their cells and place them on lockdown;
3.    Attempt to quell a minor disturbance (e.g. fight between inmates) by issuing verbal commands to the involved inmates;
4.    Never place himself between fighting inmates but will wait for assistance from responding Emergency Response Team (ERT) officers. . . .

The Correctional Defendants submitted as an exhibit the DVD tier video of the incident. ECF 44-4 (filed separately). The video has no sound. It is a compilation of six cameras that were in use, five of which portray different angles of the lunch area where the assault occurred. The sixth camera focuses on the location where the ERT entered the area.

As noted, plaintiff filed a supplement (ECF 53) based on her review of the tier video. She asserts: "It was very clear [in the video] that the officers were negligent, deliberate and indifferent." *Id.* at 1. I disagree.

I reviewed the video several times. It shows that plaintiff was suddenly attacked at 10:15:57 a.m., according to the video timeline. Four female correctional officers were located behind a counter and they immediately sprang into action when the fight erupted. One correctional officer immediately got on the telephone or radio. Within ten seconds, two of the correctional officers began to move towards the altercation. By 10:16:15, those two officers and another inmate are seen next to plaintiff and Sellers. The body language of the officers suggests that the officers sought to stop the fight, although they did not attempt physically to restrain Sellers. The other guards were directing the other detainees in the area to leave.

At 10:16:19, one of the correctional officers pulled away a detainee who was not involved in the fight, but who was standing next to the assailant. At that moment, Sellers

paused.   Two officers were in close proximity to Sellers.   They were then joined by a third officer.   It appears that the correctional officers exchanged words with Sellers from 10:16:19 to 10:16:27, during which Sellers again paused.   Sellers resumed her assault on plaintiff at 10:16:27.   Three correctional officers then stepped several feet away, while gesturing vigorously at Sellers.   The correctional officers seemed agitated and appeared to be shouting.

Sellers then paused again, from about 10:17:04 to 10:17:16.   The officers were still pointing at Sellers, from a distance of a few feet.   At around 10:17:17, the attack resumed.   Two officers move towards the assailant.   At 10:17:23, two of the correctional officers were still within very close range of the fight, but they did not physically attempt to subdue Sellers.   At 10:17:25, six male ERT officers entered through doors onto the unit.   Sellers submitted to their authority.

The Medical Defendants submitted over 160 pages of plaintiff's medical records.   *See* ECF 30-3.[4]   The records show that plaintiff was evaluated by a nurse at 11:20 a.m. on November 19, 2014, *i.e.*, shortly after the attack.   *Id.* 2-3.   The entry indicates that she was the "Victim of Violent Incident."   *Id.* at 2.   Plaintiff was crying and upset.   *Id.*   She complained of head pain, and had a big knot on her forehead, but she was not found to be in acute distress.   *Id*. at 2-3. However, her blood pressure was elevated and, as a result, she was placed on a three-day blood pressure check.   *Id.* at 2.   Plaintiff requested an x-ray of her head, nose, "sides," and chest. She complained of blurred vision and a headache. *Id*. at 4.   The nurse gave plaintiff ice and Tylenol. The nurse also directed plaintiff to contact medical staff if her symptoms worsened.   *Id.* at 3.

The following day, November 20, 2014, plaintiff was seen by a mental health provider. They discussed the recent incident.   *Id*. at 36.   Plaintiff was oriented to time, person, place, and

---

[4] The record includes some duplicates.

situation and exhibited no gross cognitive defects. She was appropriately groomed and was calm and cooperative. ECF 30-3 at 36. The diagnosis stated, *id.*: "Depression with psychotic features." *Id.* The plan was to "continue individual therapy." *Id.*

On November 21, 2014, plaintiff was seen by a physician assistant due to her complaints of facial bruises and decreased vision. *Id.* at 60-61. She also complained of generalized muscle aches and tenderness. *Id.* Significant hair loss was noted and plaintiff's head was bruised. *Id.* at 60. However, her pupils were equal and reactive to light, although moderate swelling and peri-orbital discoloration was noted. *Id.* Plaintiff was diagnosed as suffering from facial bruises, bilateral peri-orbital edema, musculoskeletal pain, and hair loss. She was prescribed Loratadine, an antihistamine used to decrease swelling, for fourteen days. *Id.*

Meskerem Asresahegn, M.D., a physician employed at PGCDC and licensed in Maryland since 1998, submitted two declarations. ECF 30-2; ECF 37-1. He first saw plaintiff on November 24, 2014, five days after her altercation with Sellers. ECF 30-2, ¶¶ 3, 5; ECF 37-1, ¶ 5. At that time, plaintiff complained of muscle pain in various areas of her body and facial swelling. She had a bruise on her forehead and hair loss. *Id.* However, she "did not present" with any "neurological abnormalities" indicative of a brain injury. ECF 30-2; ECF 37-1; *see also* ECF 30-3 at 62-65. She denied loss of consciousness, severe headaches, vomiting, or blurred vision. ECF 30-3 at 62; ECF 37-1, ¶ 5.

X-rays were taken that day. *Id.* at 63. They revealed no abnormalities in plaintiff's facial bones or eye sockets. ECF 30-3 at 33; *see also* ECF 30-2, ¶ 8; ECF 37-1, ¶ 5. Plaintiff was prescribed non-steroidal anti-inflammatory drugs ("NSAIDs") and a muscle relaxer, and it was recommended that she rest and restrict her physical activity. ECF 30-2, ¶ 5; ECF 37-1, ¶ 5.

Contrary to plaintiff's assertions (ECF 1 at 3), she "did not present with an 'open maxillary' artery or leaking 'cerebral fluid' on November 24, 2014 or at any other time." ECF 30-2, ¶ 5; *see* ECF 37-1, ¶ 7.  Moreover, Dr. Asresahegn has opined that "[t]here was no medical necessity for emergent hospital treatment or more extensive diagnostic testing." ECF 30-2, ¶ 5; *see also* ECF 37-1, ¶ 6.  He avers that plaintiff "did not exhibit any signs of neurological abnormalities . . . such as a concussion." ECF 37-1, ¶ 6.

Plaintiff was provided with follow up care on December 1, 2014, by Dr. Asresahegn. ECF 30-3 at 65-66; ECF 147-148. She complained of occasional headaches, jaw pain when chewing hard food, mild back pain, and generalized body ache.  However, Kamara stated that her pain was "much better compared with one week ago." *Id.* at 65. She also advised that Naproxen and Flexeril helped manage her pain. Plaintiff denied blurred vision, vision changes, neck pain or stiffness, or sinus tenderness.  She was in mild pain.  No abnormalities were noted in plaintiff's head or eyes and her neck was supple. *Id.* at 65-66. Her blood pressure was 114/76. *Id.*  Plaintiff's prescription for NSAIDs and muscle relaxers were continued. Plaintiff was advised to perform stretching exercises and to follow up as needed. *Id.* at 66

The following day, plaintiff complained, in a request for health services form, that she had issues with short term memory. *Id.* at 37. On December 5, 2014, via a request for health services form, she complained of pressure in her forehead, to her nose, and a headache. *Id.* at 7. On December 7, 2014, plaintiff complained, via the request for health services form, of headache and pain in her ears after her pain medication wore off. *Id.* at 8.

Plaintiff was seen by Dr. Asresahegn  on December 9, 2014, due to plaintiff's complaints of occasional forehead pain, which she attributed to the altercation on November 19, 2014. *Id.* at 5-6.  At that time plaintiff also complained of anxiety regarding her legal case. *Id.* at 5. Plaintiff

denied blurred vision, vision change, and/or neck pain. She was alert and in no pain or distress. Examination showed no head abnormalities and her pupils were equal in size and reactive to light. *Id.* She reported no sinus tenderness, nor did she offer any complaints of memory issues at that time.  Plaintiff was diagnosed with soft tissue injury and advised to exercise and take pain medications as necessary.  *Id.* at 5-6.

A nurse saw Kamara on December 16, 2014, for an unrelated issue. She did not offer any complaints of headache, back pain, or memory issues. *Id.* at 9-10.

Dr. Asresahegn again evaluated plaintiff on January 2, 2015. *Id.* at 67-68, 149-150. Plaintiff denied blurred vision or vision changes.  Plaintiff offered no complaints of back pain or memory issues.  But, she appeared in mild pain and distress. Her head, neck and eyes were normal. *Id.*  Plaintiff was diagnosed with a sinus infection, bacterial vaginosis, and was prescribed an antibiotic and decongestant.  *Id.*

Plaintiff was next evaluated by Dr. Asresahegn on January 26, 2015, for an unrelated complaint.  ECF 30-3 at 12-15.[5]  At that time she denied blurred vision, vision changes, or neck pain.  *Id.* at 12. Her head and neck were normal, her pupils were equal in size and reactive, and she reported no sinus tenderness.  No complaints of memory issues, back pain, or headache were offered.  *Id.* at 12-13.

Plaintiff required treatment on February 26, 2015, indicating her medication had run out. *Id.* at 15.  She refused a nursing assessment on February 28, 2015. *Id.* at 16.

Kamara was examined on March 3, 2015, due to complaints of chronic intermittent headaches and back pain since the November assault.  *Id.* at 70, 152-153.  She complained of

---

[5] In ECF 37-1, ¶ 8, Dr. Asresahegn avers that he saw plaintiff on January 19, 2015.  His citations to the medical record reflect the date of January 26, 2015, not January 19, 2015.  The discrepancy is not material.

flashbacks to her injuries but did not offer any complaints of memory loss. *Id*. Plaintiff did not appear in distress and no head, eye, or neurological abnormalities were observed. Her blood pressure was 115/83. *Id.* at 70. Given plaintiff's reports of headaches, the provider noted that plaintiff may have suffered a mild concussion and prescribed Topamax. *Id*. at 71. She was directed to follow up as needed. *Id.*

On March 10, 2015, plaintiff requested care for a headache and joint and back pain. *Id*. at 20. She was seen by a nurse on March 14, 2015, and reported a headache at 6 on a 10 point pain scale. *Id*. at 17. She did not complain of memory issues. *Id*. at 17-19. Plaintiff reported that Naproxen was effective for her headaches and that her anxiety medication made her dizzy. *Id*. at 17. No abnormalities were observed as to plaintiff's neck, eyes, or head. Plaintiff's gait was normal and she had equal and strong hand grips, which ruled out disc herniation or spinal nerve damage. *Id*. at 18; ECF 30-2, ¶ 22. Plaintiff was prescribed Naproxen and advised to contact the medical providers if her symptoms worsened. ECF 30-3 at 18.

Kamara requested pain medication on April 6, 2015. ECF 30-3 at 24. On April 9, 2015, she was seen by a nurse due to her complaints of headache. *Id*. at 21-23. Plaintiff reported that her headache was dull and achy and that noise and light made it worse. *Id*. at 21. She did not appear in acute distress and did not exhibit any neurological abnormalities. *Id*. at 21-22. Her neck, gait, and hand grips were normal. *Id*. at 22. She did not complain of any memory issues or back pain. *Id*. at 21-22. She was prescribed Tylenol for two weeks and was instructed to follow up if her symptoms worsened. *Id*. at 22.

Plaintiff was next seen by medical staff on May 26, 2015, for an unrelated complaint. At that time she denied blurred vision or vision changes, neck stiffness, or pain. *Id*. at 74. She was

in no acute distress. She denied sinus tenderness and her eyes were normal. No complaints of headache, memory issues, or back pain were offered. *Id*. at 74-75.

On June 21, 2015, plaintiff again complained of headache and back pain. *Id*. at 27. She requested an MRI or CAT scan. *Id*. On June 28, 2015, she complained of head and back pain. *Id*. at 28.

Dr. Asresahegn evaluated plaintiff on June 30, 2015, due to her complaints of headaches. *Id*. at 25-26. Plaintiff stated that the headaches were usually on her left side and lasted a few hours. *Id.* at 25. She denied vomiting or photophobia. She stated that she believed she had a brain aneurysm. *Id*. She denied neck pain, blurred vision, or vision changes. She appeared to be in mild pain. *Id*. Examination demonstrated that plaintiff's head, eyes, and neck were normal and she exhibited no neurological abnormalities. *Id*. at 26. Plaintiff did not complain of memory issues or back pain. *Id*. at 25-26. Dr. Asresahegn diagnosed plaintiff as suffering with migraine headaches and prescribed a NSAID, based on plaintiff's reported improvement of her symptoms with the use of NSAIDs. *Id*. at 26.

On July 14, 2015, plaintiff asked to see Dr. Asresahegn, complaining of head, back, and neck pain. *Id.* at 31. She was seen the following day by a nurse for complaints of headaches, back pain, and a request for a back brace. *Id*. at 29-30. Plaintiff complained of back pain with a rating of a 7 to 10 out of 10. *Id*. at 29. However, she did not appear to be in acute distress and did not exhibit tenderness on her back. *Id*. at 29-30. Plaintiff's hand grip, strength, and straight leg raise (a test for disc herniation), posture, and gait were all normal. *Id*.; *see also* ECF 30-2, ¶ 27. Plaintiff asked the nurse to see a doctor for her headache. The nurse referred plaintiff to the doctor and prescribed Naproxen as requested by plaintiff. *Id*. at 30.

14

After plaintiff's appointment with the nurse, she was taken back to the medical unit due to complaints that she felt dizzy and had fallen. ECF 30-3 at 77. While crying, Kamara said that she was upset with her housing unit officers. No injuries were observed. A doctor kept plaintiff in the infirmary for observation. *Id*. at 78. She appeared stable. *Id*. at 79. On July 16, 2015, while still housed in the infirmary, plaintiff denied any complaints. *Id*. at 80-81. That same day she was transferred to another facility. ECF 30-2, ¶ 28.

To be sure, plaintiff suffered "moderate swelling" and "bruising around the eyes." ECF 30-2 ¶ 10. Although plaintiff complained of blurred vision on November 19, 2014, and decreased vision on November 21, 2014, the examination on November 21, 2014, showed her pupils were equal and reactive with no dilation. According to Dr. Asresahegn, those findings, along with other aspects of the exam, "ruled out a head injury." *Id*. at 4-5.

Further, Dr. Asresahegn opines that plaintiff's subjective reports of extreme back pain were at times inconsistent with her physical presentation. ECF 30-2 at 11, ¶ 27. She explained that plaintiff exhibited no tenderness of her back, her gait was normal, and testing did not reveal back injuries that "could have caused her reported extreme pain." *Id.*

In addition, Dr. Asresahegn opines that plaintiff was provided medically appropriate treatment in connection with the assault on November 19, 2014. ECF 30-2 at ¶¶ 12, 29. As the medical record reflects, Dr. Asresahegn and others saw plaintiff repeatedly for follow-up care to address plaintiff's subjective complaints. *Id*. Plaintiff did not present with any neurological abnormalities. *Id*. According to Dr. Asresahegn, blurred vision can be caused by a variety of issues and, if plaintiff's blurred vision were caused by significant head trauma, she would have exhibited other signs of trauma, such as loss of consciousness, a severe headache, vomiting, or

noticeably decreased mental status.  *Id.* at 4, ¶ 8.  Dr. Asresahegn also offers that a head injury may cause internal bleeding, resulting in dilation of the eyes or unequal pupil size. *Id.* ¶ 10.

According to Dr. Asresahegn, transportation to a hospital or referral for an MRI or CAT scan were not indicated.  *Id.* ¶ 12.  Even if plaintiff had suffered a concussion, Dr. Asresahegn maintains that the course of treatment would have consisted of observation, rest, and pain medication, *i.e.,* the same course of treatment as plaintiff received. *Id.*  Plaintiff did not present with a need for further treatment. *Id.*

In sum, and of import here, Dr. Asresahegn avers:  "Based upon my review of the medical records . . . it is my opinion within a reasonable degree of medical certainty, that the care provided to [plaintiff] for her soft tissue head injury and other post-altercation injuries met or exceeded the standard of care . . . ." *Id.* ¶ 6.

Dr. Ijeh avers in his Declaration that he treated plaintiff for depression, which was related to her incarceration and not exacerbated by the attack on November 19, 2014.  ECF 30-4, ¶ 6. According to Dr. Ijeh, plaintiff exhibited no cognitive defects suggestive of a neurological injury at any of her mental health appointments. *Id.* Plaintiff received continuous mental health care in order to treat her depression. *Id.*  She was seen regularly by mental health care providers from July 1, 2014, through May of 2015.  *Id.* ¶¶ 7-27; *see also* ECF 30-2 at 32, 36, 38-58, 72-73.

Abu Kalokoh avers that he is employed as the Health Services Administrator at PGCDC. ECF 30-5, ¶ 1. Kalokoh serves in an administrative, budgetary, and operational role, and does not practice medicine or treat inmates. *Id.* ¶¶ 1, 2.  Nor does he dictate a patient's course of medical treatment. *Id.* ¶ 1.    Further, Kalokoh avers that he did not charge plaintiff for medication, as there is no charge for medications prescribed by a health care provider at the

institution. *Id.* ¶ 5.  According to Kalokoh, charges for sick-call evaluations are charged through the county jail and he has no discretion as to who is charged or how much is charged. *Id.*

Kalokoh does not recall receiving a request for copies of medical records from plaintiff. Had he received such a request, he indicates he would have routed the request to the proper party. *Id.* ¶ 6.

## II.      Standard of Review

The Medical Defendants' motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.  ECF 30.  A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).  Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss."  *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).  However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. The City of Salisbury, Maryland*, ___ Fed Appx. ____, 2016 WL 6958439, at * 2 (4th Cir. Nov. 29, 2016) (per curiam).

A court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so.  *See Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998) (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*,

109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Adams Housing, LLC*, *supra*, at *2 ("The court must give notice to ensure that the party is aware that it must 'come forward with all of [its] evidence.'") (citation omitted).   However, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin,* 149 F.3d at 261.

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it."   5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.).   This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149.   In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165, 167.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours and Co. v. Kolon Industries*, *Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2012); *see Putney v. Likin*, 656 Fed. App'x 632, 638 (4th Cir. 2016); *McCray v. Maryland Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir. 2015). However, "the party opposing summary judgment 'cannot complain that summary judgment was

granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).  To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, [she] cannot present facts essential to justify [her] opposition," without needed discovery.  Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

"[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted).  A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment."  *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'"  *Harrods*, 302 F.3d at 244 (citations omitted).  But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature.  Although the Fourth Circuit has placed "'great weight'" on

the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted).

According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Harrods*, 302 F.3d at 244-45 (internal citations omitted); *see also Putney*, 656 Fed. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). Moreover, "[t]his is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 Fed. App'x at 638.

Plaintiff and the Correctional Defendants have engaged in discovery. ECF 23; ECF 26; ECF 43; ECF 45. But, plaintiff seeks additional discovery due to her dissatisfaction with the responses of the Correctional Defendants to her discovery requests. ECF 43 at 2-3. She also sought discovery from the Medical Defendants. ECF 34-1. They opposed that request. ECF 34. Plaintiff did not file an affidavit in compliance with Rule 56(d) as to her request for discovery from the Medical Defendants. And, she received exhibits to the dispositive motions filed in this case, including copies of her medical records, affidavits from correctional officers, the tier video of the incident, and the policy manual for PGCDC.

I recognize that plaintiff is self-represented. Nevertheless, plaintiff has provided no indication as to what additional information she requires in order to respond to the pending motions. Plaintiff has not provided the basis for any legitimate need for additional discovery as

to any of the named defendants.[6]  Nor is there any indication that additional materials would create a genuine issue of material fact.  As such, I am satisfied that it is appropriate to address both motions as summary judgment motions, because this will facilitate resolution of this case. Therefore, I turn to the applicable standard of review.

Summary judgment is governed by Fed. R. Civ. P. 56(a).  It provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion.  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004).  The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness credibility."  *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at

---

[6] As noted, I previously ordered the Correctional Defendants to make the tier video available to plaintiff.  ECF 51.

249. Moreover, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.

Nevertheless, to defeat summary judgment, conflicting evidence, if any, must give rise to a *genuine* dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id*. at 248; *see Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Id*. at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*.

Because plaintiff is self-represented, her submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

### III.  Discussion

A.  The Price George's County Department of Corrections.

Title 42 U.S.C.§ 1983 provides:

> Every *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person with the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured . . ." (Emphasis supplied).

Conduct amenable to suit under 42 U.S.C. §1983 must be conduct taken by a person. The Prince George's County Department of Corrections is not a person amenable to suit under § 1983.  Therefore, judgment shall be entered in favor of the PGCDC.

B.      Pretrial detention

The constitutional protections afforded to a pretrial detainee under the Fourteenth Amendment are coextensive with those provided by the Eighth Amendment.  *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979).  "Due process rights of a pretrial detainee are at least as great as the eighth amendment protections available to the convicted prisoner."  *Hill v. Nicodemus*, 979 F.2d 987, 991 (4th Cir. 1992) (citing *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988)).  The question is whether the conditions amount to punishment of the pretrial detainee, because due process proscribes punishment of a detainee before proper adjudication of guilt.  *Bell v. Wolfish*, 441 U.S. at 535.  However, "not every inconvenience that is encountered during pre-trial detention amounts to 'punishment' in the constitutional sense."  *Martin*, 849 F.2d at 870 (citing *Bell*, 441 U.S. at 538-40).

C.      Failure to Protect

Plaintiff alleges that the Correctional Defendants failed to provide adequate supervision and security to protect her, and as such her right to be free from cruel and unusual punishment has been violated.  The right to be free from cruel and unusual punishment includes the right to be protected from a substantial risk of serious harm at the hands of other inmates.  *See Farmer v.*

*Brennan,* 511 U.S. 825 (1994); *Makdessi v. Fields*, 789 F.3d 126 (4th Cir. 2015);  *Winfield v. Bass*, 106 F.3d 525, 531 (4th Cir. 1997); *Belcher v. Oliver,* 898 F.2d 32, 34 (4th Cir. 1990).

A failure-to-protect claim brought by a pretrial detainee constitutes a due process claim under the Fourteenth Amendment.  But, the same standards apply as for an Eighth Amendment claim brought by a convicted prisoner. *See, e.g.*, *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001); *Grimes v. Warden, Baltimore City Detention Center*, 2012 WL 2575373, at *1 n.2 (D. Md. June 29, 2012); *Eastman v. Warden, Baltimore City Detention Center*, 2011 WL 210343, at *2 n.3 (D. Md. Jan. 21, 2011); *accord Smith v. Sangamon County Sheriff's Dept.*, 715 F.3d 188, 191 (7th Cir. 2013); *Goodman v. Kimbrough*, 718 F.3d 1325, 1331 & n.1 (11th Cir. 2013).

"The Eighth Amendment's prohibition on cruel and unusual punishments imposes certain basic duties on prison officials."  *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016) (citing *Farmer*, 511 U.S. at 832).   Those duties "include maintaining humane conditions of confinement, including the provision of adequate medical care and . . . 'reasonable measures to guarantee the safety of the inmates.'"  *Id.* (citation omitted).  To be sure, "not every injury suffered by a prisoner at the hands of another 'translates into constitutional liability for prison officials responsible for the victim's safety.'"  *Makdessi*, 789 F.3d at 133 (citation omitted).  But, "corrections officers have 'a duty to protect prisoners from violence at the hands of other prisoners,' for '[b]eing violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society.'"  *Raynor*, 817 F.3d at 127 (citation omitted) (alteration in *Raynor*).

A two-part test that consists of both an objective and a subjective component must be satisfied in order for a plaintiff to establish liability for failure to protect.  *See Raynor*, 817 F.3d at 127.

Objectively, the prisoner "must establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury," or a substantial risk of such injury. *Danser v. Stansberry*, 772 F.3d 340, 346–47 (4th Cir. 2014) (internal quotations omitted). The objective inquiry "requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993) (emphasis in *Helling*).

Subjectively, a plaintiff must establish that the prison official involved had "a sufficiently culpable state of mind" amounting to "deliberate indifference to inmate health or safety." *Farmer*, 511 U.S. at 834. To establish a culpable state of mind, there must be "evidence suggesting that the prison official had actual knowledge of an excessive risk to the [prisoner's] safety." *Danser*, 772 F.3d at 347. This may include evidence that prison officials were "'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,'" and that the inference was drawn. *Raynor*, 817 at 128 (citing *Farmer*, 511 U.S. at 837). A plaintiff may "prove an official's actual knowledge of a substantial risk 'in the usual ways, including inference from circumstantial evidence,'" and "'a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Raynor*, 817 F.3d at 128 (citing *Farmer*, 511 at 837).

Actual knowledge of a substantial risk does not necessarily result in liability. If a prison official responded reasonably to a risk, he or she "may be found free from liability. . . ." *Farmer*, 511 U.S. at 844.

Of import here, in a failure-to-protect case, "'prison guards have no constitutional duty to intervene in the armed assault of one inmate upon another when intervention would place the guards in danger of physical harm.'" *Raynor*, 817 F.3d at 128 (quoting *Prosser v. Ross*, 70 F.3d

1005, 1008 (8th Cir. 1995)).   On the other hand, the failure to take any action "to stop an ongoing assault on a prisoner can amount to deliberate indifference." *Raynor*, 817 F.3d at 128 (citing *Winfield v. Bass*, 106 F.3d 525, 532 (4th Cir. 1997) (en banc); *see also Odom v. S.C. Dep't of Corr.*, 349 F.3d 765, 773 (4th Cir. 2003).   If the officer "had a reasonable opportunity to act and 'simply refused to do so,'" the officer's failure to intervene during an assault may give rise to liability under § 1983.   *Raynor*, 817 F.3d at 128 (citation omitted).

Plaintiff maintains that the Correctional Defendants failed to act to end the attack upon her.   She has submitted affidavits of three inmates, two of whom saw the occurrence.   The affidavits are directly refuted by the affidavits of Baker, Stewart, Ford, and Taylor.   However, the Court may not resolve conflicting affidavits on summary judgment.

Nevertheless, in this case, unlike in *Raynor*, plaintiff's contentions are at odds with the video recording of the incident.   And, that recording captured the altercation from five different cameras with five different angles.   *See Witt v. West Virginia State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) (stating that "when a video 'quite clearly contradicts the version of the story told by [the plaintiff] ... so that no reasonable jury would believe it, a court should not adopt [the plaintiff's] version of the facts for purposes of ruling on a motion for summary judgment .' ") (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)).

As indicated, the tier video consists of images from six cameras, five of which focus on the lunch area.   The sixth camera captures the area where the ERT entered.   The video is powerful, objective evidence of what occurred.[7]   The cameras show a spontaneous, brutal, and seemingly unprovoked and sudden attack by Sellers on plaintiff.   The video also reveals that all four officers on the scene immediately sprang into action when the attack began.   One got on the

---

[7] I incorporate here the factual account that appears on pages 8-9.

radio or phone, presumably calling for help.  Two officers approached the assailant as she was attacking plaintiff, and two officers directed other detainees to leave the area.  One of those officers then joined the two officers in approaching the assailant.

The video makes clear that the Correctional Defendants did not physically intercede to restrain Sellers.  In other words, they did not engage in physical contact with Sellers to halt the attack upon plaintiff.  But, it is also clear that they never just sat back and let the fight proceed. The officers who approached the assailant were in close proximity to her and seemed to shout commands that the attacker ignored.  The officers appeared agitated and never left the scene.  As noted, they also endeavored to maintain security by directing other detainees in the area to leave. And, within 90 seconds of the outbreak of violence, six male officers responded to the scene.

The female officers were not required to risk injury to themselves by physically confronting Sellers.  Indeed, if they had tried to intervene, without success, matters might have become more dangerous.  And, it is also salient that the conduct of the officers was consistent with their duties, as set forth in the Manual.  As noted, PGCDC policy directed staff not to put themselves in harm's way by intervening physically in a fight between inmates. Rather, the Manual directs staff to call for the ERT, lock in other detainees, and issue oral commands to stop the altercation. That is precisely what the Correctional Defendants did.

As indicated, the video tells a version at odds with plaintiff's account.  As the Supreme Court explained in *Scott v. Harris*, 550 U.S. at 380, when "opposing parties tell two different stories, one of which is blatantly contradicted" by video evidence contained in the record, "so that no reasonable jury could believe it, a court should not adopt that version of the facts . . . ." To be sure, *Scott* does not grant a court license to reject outright a party's account where "documentary evidence, such as a video," merely "offers *some* support for [the other side's]

27

version of events." *Witt*, 633 F.3d at 276 (emphasis in original); *see Sawyer v. Asbury*, 537 F. App'x 283, 291 (4th Cir. 2013). At the same time, "[i]ncontrovertible evidence relied on by the moving party, such as a relevant videotape whose accuracy is unchallenged, should be credited by the court," if the video "so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party." *Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007). That is the situation here.

Plaintiff and her fellow detainees report that the assault lasted for 15 minutes. The Court does not doubt that for plaintiff the attack seemed to last an eternity. But, the indisputable facts, as shown by the video, are that from the inception of the attack until the appearance of the ERT on the tier, less than 90 seconds elapsed. The Correctional Defendants acted reasonably in responding to the sudden and unprovoked attack on plaintiff. Therefore, Baker, Stewart, Ford, and Taylor are entitled to summary judgment on this claim.

As to Dr. Ijeh, plaintiff baldly claims that Dr. Ijeh was responsible for Sellers being housed on a general population tier and therefore responsible for the attack upon her. She claims that he knew Sellers had previously been housed on segregation status and had attacked other inmates. *See* ECF 34 at 5. Ijeh disputes such knowledge. ECF 30-4, ¶ 5. Even if Ijeh were aware that Sellers had assaulted other inmates, such information is insufficient to establish that Ijeh was aware Sellers posed a risk to plaintiff. Nor does such information demonstrate that Ijeh disregarded the risk. Ijeh is entitled to summary judgment.

D.     Medical Claim

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *Scinto v. Stansberry*, 841 F.3d 219,

225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle*, 429 U.S. at 106; *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).   The Fourth Circuit has characterized the applicable standard as an "exacting" one. *Lightsey*, 775 F.3d at 178.

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or to ensure that the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *King*, 825 F.3d at 219; *Cf. Heyer v. Boyd*, ____ F.3d ____, No. 15-6826, slip op. at 13-14 (4th Cir. Feb. 23, 2017). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Scinto*, 841 F.3d at 225.

A "'serious . . . medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan,* 196 F.3d 839, 846 (7th Cir. 1999)); *see Heyer v. Boyd*, *supra*, slip op. at 14; *Scinto*, 841 F.3d at 228. And, in a case involving a claim of deliberate indifference to a serious medical need, the inmate must show a "significant injury." *Danser*, 772 F.3d at 346 n.8.

Proof of an objectively serious medical condition does not end the inquiry. The subjective component requires a determination as to whether the defendant acted with "a sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *see Farmer*, 511 U.S. at 839-

40; *Scinto*, 841 F.3d at 225. In order "[t]o show an Eighth Amendment violation, it is not enough that an official *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Lightsey*, 775 F.3d at 178.

"True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997); *see also Young v. City of Mt. Ranier*, 238 F.3d 567, 575-76 (4th Cir. 2001). As the *Farmer* Court explained, 511 U.S. at 837, reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." Thus, "[a]ctual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).

Although the deliberate indifference standard "'entails more than mere negligence . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *King*, 825 F.3d at 219 (quoting *Farmer*, 511 U.S. at 835); *see Heyer v. Boyd*, *supra*, slip op. at 17.  A plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "'that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Makdessi*, 789 F.3d at 133 (quoting *Farmer*, 511 U.S. at 842).

Moreover, if a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk, no matter how obvious." *Brice*, 58 F.3d at 105. In *Scinto*, 841 F.3d at 226, the Fourth Circuit said:

> A plaintiff also makes out a prima facie case of deliberate indifference when he demonstrates "that a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official . . . had been exposed to information concerning the risk and thus must have known about it . . . ." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (first alteration in original) (internal quotation marks omitted) (quoting *Farmer*, 511 U.S. at 842). Similarly, a prison official's "[f]ailure to respond to an inmate's known medical needs raises an inference [of] deliberate indifference to those needs." *Miltier v. Beorn*, 896 F.2d 848, 853 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837.

Even if the requisite subjective knowledge is established, an official may still avoid liability if he "responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844; *see Scinto*, 841 F.3d at 226. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000) (citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)).

Notably, because deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness," it follows that, "as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Lightsey*, 775 F.3d at 178; *see also Scinto*, 841 F.3d at 225; *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986). What the Court said in *Grayson v. Peed*, 195 F.3d 692, 695- 96 (4th Cir. 1999), resonates here: "Deliberate

indifference is a very high standard – a showing of mere negligence will not meet it . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences . . . To lower this threshold would thrust federal courts into the daily practices of local police departments."

With regard to medical care providers, "any negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones*, 145 F.3d 164, 166 (4th Cir. 1998). Without evidence that a doctor linked presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge required for Eighth Amendment liability is not present. *Id*. at 169 (actions inconsistent with an effort to hide a serious medical condition, refutes presence of doctor's subjective knowledge).

In essence, the treatment rendered must be so grossly incompetent or inadequate as to shock the conscience or to be intolerable to fundamental fairness. *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citation omitted) (*overruled in part on other grounds by Farmer*, 511 U.S. at 837; *aff'd in pertinent part by Sharpe v. S.C. Dep't of Corr.*, 621 Fed. Appx. 732 (Mem) (4th Cir. 2015). And, the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable*." *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977) (emphasis added).

Thus, inmates do not have a constitutional right to the treatment of their choice.  *Dean v. Coughlin*, 804 F.2d 207, 215 (2nd Cir. 1986).  And, mere disagreements as to the need for or the appropriate extent of medical treatment do not give rise to a constitutional injury.  *See Estelle*, 429 U.S. at 105-06; *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985).

Here, the record indicates that plaintiff's requests were considered and her needs were addressed.  The fact that every request for medical tests was not approved does not reflect deliberate indifference. To the extent some of plaintiff's complaints have gone unaddressed, "an inadvertent failure to provide adequate medical care does not amount to deliberate indifference." *Estelle*, 429 U.S. at 105.

Plaintiff's numerous grievances with the medical decisions regarding what tests and treatments are necessary in light of the symptoms presented are reflective of her frustration, but "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849(4th Cir.1985) (citing *Gittlemacker v. Prasse,* 428 F.2d 1, 6 (3rd Cir.1970)).  There are no exceptional circumstances alleged in this case.

Plaintiff was seen immediately after the assault ended.  Thereafter, she was seen regularly by medical and mental health staff. She was provided analgesic medication, diagnostic testing, and counseling.  Had plaintiff suffered a concussion as a result of the assault, the treatment she received was consistent with that diagnosis as well.  Plaintiff's claim is nothing more than a disagreement with the decision of her medical providers. Her claim that further diagnostic testing was required and/or recommended is not supported by the record.  Therefore, the Medical Defendants are entitled to summary judgment.

D.      Supervisory Liabiilty

Plaintiff asserts claims against Mary Lou McDonough, Director of the PGDC; Harry L. Hilton, Head of Security; Adedeji Adewunmi, Zone Officer; and Abu Kalokoh, Health Services Administrator of PGCDC.  It is well established that the doctrine of *respondeat superior* does not apply in § 1983 claims.  Supervisory officials are liable only for their own wrongdoing or for

supervisory actions where they are aware that their subordinates have engaged in pervasive and unconstitutional conduct. *See Monell v. New York Dep't of Social Serv.*, 436 U.S. 658, 691 (1978); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no *respondeat superior* liability under § 1983). Liability of supervisory officials "is not based on ordinary principles of *respondeat superior*, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). In *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994), *cert. denied*, 513 U.S. 813 (1994), the Fourth Circuit set forth three elements that a plaintiff must prove to establish supervisory liability under § 1983:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*See also King*, 825 F.3d at 224 (applying the *Shaw* elements); *Armstrong v. City of Greensboro*, ___ F. Supp. 3d ___, 2016 WL 3167178, at *11 (M.D.N.C. June 6, 2016) (same); *Kitchen v. Ickes*, 116 F. Supp. 3d 613, 629 (D. Md. 2015) (same), *aff'd*, 644 F. App'x 243 (4th Cir. 2016), *cert. denied*, ___ U.S. ___, 2016 WL 5874521 (Dec. 5, 2016).

According to the *Shaw* Court, to satisfy the first element, a plaintiff must show "(1) the supervisor's knowledge of (2) conduct engaged in by a subordinate (3) where the conduct poses a pervasive and unreasonable risk of constitutional injury to the plaintiff." 13 F.3d at 799 (citing *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984)). And, establishing a "pervasive" and "unreasonable" risk of harm "requires evidence that the conduct is widespread, or at least has

been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *Shaw*, 13 F.3d at 799. Here, the record is devoid of any evidence indicating a pervasive or "widespread" problem in diagnosing and treating assault victims.

Where, as here, a plaintiff points to no action or inaction on the part of supervisory defendants that resulted in a constitutional injury, the claims against the supervisory personnel must be dismissed.

## IV.  CONCLUSION

For the foregoing reasons defendants' dispositive motions, treated as motions for summary judgment, will be GRANTED.  Judgment will be ENTERED in favor of defendants and against plaintiff.

A separate Order follows.


February 24, 2017                          _____/s/_____
Date                                              Ellen L. Hollander
                                                     United States District Judge